McKee v. James, 2013 NCBC 38.

STATE OF NORTH CAROLINA

COUNTY OF ROBESON

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 3031

LANNESS K. McKEE and LANNESS K.
McKEE, JR.,

                      Plaintiffs,

v.

HUNTINGTON JAMES, JOHNNIE
MARSHBURN, and COCONUT
HOLDINGS, LLC,

                      Defendants,

v.

LANNESS K. McKEE & COMPANY, INC.,

                      Nominal Defendant.

ORDER AND OPINION

*Brazil & Dunn by Chad W. Dunn and The Foster Law Firm, P.A. by Jeffrey B. Foster, for Plaintiffs.*

*Poyner Spruill, LLP by Jason B. James and Joshua B. Durham, for Defendant Huntington James.*

*Bell, Davis, & Pitt, P.A. by Edward B. Davis and Michael D. Phillips, for Defendant Coconut Holdings, LLC.*

*Bowen & Barry by Woody Bowen and Womble & Campbell by Kyle Graham Melvin, for Defendant Johnnie Marshburn.*

Murphy, Judge.

{1}     **THIS MATTER** is before the Court upon Defendant Huntington James' ("James") Motion to Dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the "Motion").  Having considered the Motion, briefs, and contentions of counsel made during a hearing before this Court on May 23, 2012, the Court **GRANTS** in part and **DENIES** in part the Motion.

# I.
## PROCEDURAL HISTORY

{2} On August 27, 2009, Plaintiffs Lanness K. McKee ("McKee") and Lanness K. McKee, Jr. ("Key") (collectively, "Plaintiffs") filed a Verified Complaint against Defendants James and Johnnie Marshburn ("Marshburn") (collectively, "Defendants") asserting claims for breach of contract, breach of fiduciary duty, fraud, unfair and deceptive trade practices, misappropriation of trade secrets, fraudulent transfer of assets to avoid creditors, conversion, conspiracy, intentional infliction of emotional distress, libel and slander, and punitive damages. (*See* V. Compl.)

{3} Defendant James filed notice of designation to the North Carolina Business Court on October 19, 2009. Subsequently, the case was designated a mandatory complex business case, and assigned to this Court on October 26, 2009.

{4} On April 1, 2010, James filed his first motion to dismiss pursuant to Rules 12(b)(6), 12(b)(7), and 9(b) of the North Carolina Rules of Civil Procedure.

{5} In response, on April 21, 2010, Plaintiffs filed their brief opposing James' first motion to dismiss and moved to amend their complaint.[1]

{6} On June 10, 2010, the Court issued its Order on the pending motions to dismiss and to amend the complaint (the "Order"). *McKee v. James*, No. 09 CVS 03031 (N.C. Super. Ct. June 10, 2010) (order granting in part and denying in part Defendant's first motion to dismiss and granting Plaintiffs' first motion to amend). In the Order, the Court dismissed, without prejudice, Plaintiffs' individual claims for misappropriation of trade secrets, fraudulent transfer of assets to avoid creditors, and conversion, concluding that the claims were derivative in nature. *Id.* The Court also granted Plaintiffs' motion to amend as to the fraud claim, and allowed for further amendment to assert proper derivative claims. *Id.* Plaintiffs then filed their First Amended Complaint on June 15, 2010. (*See* Am. Compl.)

---

[1] That same day, Plaintiffs also filed a motion to substitute Michael P. Peavey, Plaintiff McKee's trustee in bankruptcy, for McKee, which the Court granted on May 18, 2010. *McKee v. James*, No. 09 CVS 03031 (N.C. Super. Ct. May 18, 2010) (order granting Motion to Substitute a Party).

{7} On July 29, 2010, Plaintiffs filed a second motion to amend the complaint to add Coconut Holdings, LLC ("Coconut Holdings") as a defendant and to bring derivative claims on behalf of Lanness K. McKee & Company, Inc. ("McKee Craft").

{8} On October 8, 2010, the Court granted Plaintiffs' second motion to amend the complaint, and ordered Plaintiffs to include McKee Craft as a Nominal Defendant. *McKee v. James*, No. 09 CVS 03031 (N.C. Super. Ct. Oct. 8, 2010) (order granting Plaintiffs' second motion to amend).

{9} Plaintiffs filed their Verified Second Amended Complaint (the "Complaint") on October 13, 2010, adding Coconut Holdings as Defendant and McKee Craft as Nominal Defendant; asserting direct claims for breach of contract, breach of fiduciary duty, fraud, unfair and deceptive trade practices, conspiracy, intentional infliction of emotional distress, libel and slander, and punitive damages; and bringing derivative claims for breach of fiduciary duty, unfair and deceptive trade practices, misappropriation of trade secrets, fraudulent transfer of assets to avoid creditors, conversion, conspiracy, punitive damages, gross mismanagement, corporate waste, and unjust enrichment. (*See* V. 2nd Am. Compl.)

{10} James and Coconut Holdings each filed an Answer to the Complaint on November 15, 2010, and November 18, 2010, respectively.

{11} On December 2, 2011, James filed his second Motion to Dismiss seeking dismissal of Plaintiffs' direct claims for breach of contract, breach of fiduciary duty, fraud, unfair and deceptive trade practices, conspiracy, libel and slander, and punitive damages; and Plaintiffs' derivative claims for misappropriation of trade secrets, fraudulent transfer of assets to avoid creditors, conspiracy, and corporate waste.[2] (*See* James' Mot. Dismiss.) Plaintiffs responded on December 30, 2011. (*See* Pls.' Resp. Opp. Mot. Dismiss.)

{12} On May 23, 2012, the Court heard the Motion.

---

[2] In his Brief, James states that Plaintiffs agreed to dismiss their claim alleging intentional infliction of emotional distress, and, for that reason, he does not seek dismissal of that claim.

II.

FACTUAL BACKGROUND

{13}   Ordinarily, the Court does not make findings of fact in connection with motions to dismiss pursuant to Rule 12(b)(6), as such motions do "not present the merits, but only [determine] whether the merits may be reached." *Concrete Serv. Corp. v. Investors Group,* 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986) (citation omitted).  For purposes of this Order and Opinion, however, the Court recites those facts from the Complaint that are relevant to the Court's legal determinations.

{14}   Plaintiffs are citizens and residents of Robeson County, North Carolina, and shareholders in McKee Craft, a North Carolina corporation.  (V. 2nd Am. Compl. ¶¶ 1, 8.)

{15}   James resides in both North Carolina and Tampa, Florida, and owns Coconut Holdings, a North Carolina limited liability company.  (V. 2nd Am. Compl. ¶¶ 2, 4, 79–80.)  Plaintiffs allege that James operates Coconut Holdings as his alter-ego to perpetrate fraud on Plaintiffs.  (V. 2nd Am. Compl. ¶ 80.)

{16}   Forty years ago, McKee formed McKee Craft to build and sell boats. (V. 2nd Am. Compl. ¶ 8.)  Later, McKee involved his son, Key, in the business, and in 1990 Key became President of McKee Craft.  (V. 2nd Am. Compl. ¶ 11.)

{17}   McKee Craft boats are built using pressure foam-filled construction that allegedly "separates and differentiates the McKee Craft vessel from other vessels of similar size."  (V. 2nd Am. Compl. ¶¶ 14–18.)  Specifically, the boats' "unique" and "unsinkable" construction equips them to "withstand the rigorous hazards of military and law enforcement service," and, thus, enabled McKee Craft to develop a market among local, state, and federal government organizations.  (V. 2nd Am. Compl. ¶¶ 12, 16.)

{18}   In or around January 2007, James approached McKee Craft about designing and building a custom boat for his personal use.  (V. 2nd Am. Compl. ¶¶ 19, 29).  Subsequently, James expressed an interest in investing in McKee Craft. (V. 2nd Am. Compl. ¶ 29.)

{19}    In discussions with Plaintiffs, James allegedly represented that he was a sophisticated investor with "experience in matters of business and finance" (V. 2nd Am. Compl. ¶ 30); that he would "bring in the best business turnaround specialists to resolve the company's cash flow issues" (V. 2nd Am. Compl. ¶ 33); and that he would "make a significant financial investment in the company," in exchange for twenty percent of McKee Craft's shares.  (V. 2nd Am. Compl. ¶ 35.)

{20}    At the same time, McKee Craft "was enjoying unprecedented sales" to its government clients and required an influx of capital to fill their exceptional orders.  (V. 2nd Am. Compl. ¶¶ 20, 23.)  On May 30, 2007, Plaintiffs accepted James' offer to invest, and entered into an agreement to transfer shares of the company to James (the "Share Transfer Agreement").  (V. 2nd Am. Compl. ¶ 36; James' Mot. Dismiss Ex. A.)[3]

{21}    The Share Transfer Agreement provided for James' investment of $300,000 in McKee Craft as consideration for the anticipated transfer of 282.5 shares of McKee Craft stock to James, and set forth the spirit of the full stock transfer agreement that was to be executed later in 2007.  (James' Mot. Dismiss Ex. A 1–2.)

{22}    On August 6, 2007, McKee Craft, McKee, and James entered into the Common Stock Purchase Agreement ("First Purchase Agreement") with an effective date of May 30, 2007, finalizing the initial sale of approximately 19.9 percent of McKee Craft stock to James.  (James' Mot. Dismiss Ex. B 1, 68.)  The First Purchase Agreement expressly provided that it "set[s] forth the entire agreement and understanding of the parties relating to the subject matter [t]herein and merges all prior discussions and agreements between them, including the Share

---

[3] When conducting a 12(b)(6) inquiry, the court may consider documents that are the subject of the action and specifically referenced in the complaint. *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).  In the Complaint, Plaintiffs refer to a "May 2007 [] agreement" with James for the transfer of McKee Craft stock (V. 2nd Am. Compl. ¶ 36), and to "certain stock purchase agreements signed by Plaintiffs and . . . James."  (V. 2nd Am. Compl. ¶ 124.)  The Court, therefore, considers these documents, attached to James' Motion to Dismiss, in reaching its determinations. (James' Mot. Dismiss Ex. A–C.)

Purchase Agreement dated May 30, 2007, by and among [McKee Craft], McKee and [James]." (James' Mot. Dismiss Ex. B § 8(b).)

{23} Following the initial stock transfer, Plaintiffs allege that James purposely delayed delivering part of his capital investment, thereby placing McKee Craft in "a perilous financial condition" and leaving the company exposed to bankruptcy if another source of capital could not be found. (V. 2nd Am. Compl. ¶¶ 37–40.)

{24} James offered to provide the needed capital to McKee Craft, but only upon the condition that he would receive additional shares in the company. In the course of negotiating this second purchase, Plaintiffs allege that James made representations that were false when made and were made with the intention that Plaintiffs would rely on them (V. 2nd Am. Compl. ¶ 58), including (i) that James would bring in business revitalization specialists (V. 2nd Am. Compl. ¶ 43); (ii) that McKee would receive repayment of the $1.5 million debt owed to him by McKee Craft, and approximately $4 million in additional compensation, within 48 months of James' investment[4] (V. 2nd Am. Compl. ¶ 48); (iii) that McKee would continue as a salaried employee of McKee Craft until such payments were made (V. 2nd Am. Compl. ¶ 49); (iv) that Key would continue as President of McKee Craft, and receive a salary (V. 2nd Am. Compl. ¶¶ 52–53); (v) that once the business was profitable and James' investment had been repaid, Plaintiffs could reclaim their shares (V. 2nd Am. Compl. ¶ 54); and (vi) that James would take steps to fulfill existing government orders for McKee Craft boats. (V. 2nd Am. Compl. ¶¶ 55–56.)

{25} Plaintiffs further allege that James represented to vendors, banks, and third-party lenders that, "he was committed to provid[ing] all the capital necessary to resolve the financial problems" of McKee Craft, (V. 2nd Am. Compl. ¶ 44), thereby delaying foreclosure on McKee Craft assets. (V. 2nd Am. Compl. ¶ 45.)

---

[4] Plaintiffs allege that McKee "was, and is, a creditor" of McKee Craft, holding outstanding notes from the Company in excess of $1.5 million. (V. 2nd Am. Compl. ¶ 47.) Over the years, Plaintiffs also pledged their homes, vacation properties, and other real estate and assets to secure McKee Craft's debts. (V. 2nd Am. Compl. ¶ 74.)

{26}    Faced with potential bankruptcy without James' investment and relying on James' representations, Plaintiffs agreed to sell James the additional shares at only $1 per share (the "Second Purchase Agreement"). (V. 2nd Am. Compl. ¶¶ 40–42.) On February 6, 2008, Key, on behalf of McKee Craft, and James signed the Second Purchase Agreement, giving James an 88.65% ownership interest in McKee Craft. (James' Mot. Dismiss Ex. C 1, Ex. A.) Similar to the First Purchase Agreement, the Second Purchase Agreement also had a merger clause merging all prior discussions and agreements related to the subject matter of the contract into the Second Purchase Agreement as written. (James' Mot. Dismiss Ex. C § 6(b).)

{27}    Shortly thereafter, Plaintiffs allege that James took actions in breach of his promises and duty to Plaintiffs. (V. 2nd Am. Compl. ¶ 62.) Specifically, Plaintiffs assert that James removed them as employees and officers of McKee Craft (V. 2nd Am. Compl. ¶ 63); notified customers that their orders would not be filled (V. 2nd Am. Compl. ¶ 64); directed Marshburn, the company's controller and officer, not to honor warranty claims (V. 2nd Am. Compl. ¶ 65); failed to pay McKee Craft's legal obligations (V. 2nd Am. Compl. ¶ 66); locked Plaintiffs out of the facility (V. 2nd Am. Compl. ¶ 68); seized Plaintiffs' computers and records (V. 2nd Am. Compl. ¶ 69); sold raw materials subject to UCC liens without notifying creditors (V. 2nd Am. Compl. ¶ 71); sold or gave away boats (V. 2nd Am. Compl. ¶ 72); converted valuable company assets to James' own use (V. 2nd Am. Compl. ¶ 77); and auctioned boat molds and plugs to Coconut Holdings for $40,000 without regard to creditors. (V. 2nd Am. Compl. ¶ 78.)

{28}    Additionally, Plaintiffs claim that James used his access to McKee Craft's financial information, via password, and other documents to misappropriate the company's trade secrets, including the "manufacturing processes, designs . . . business plan[s], and . . . custom [boat] molds." (V. 2nd Am. Compl. ¶¶ 59–60, 138.)

{29}    Plaintiffs further assert that James and Marshburn made oral and written statements to persons in the boat industry that were false and derogatory

towards Plaintiffs, and hindered Plaintiffs' ability to work in the industry. (V. 2nd Am. Compl. ¶¶ 83–84, 88.)

{30}    Generally, Plaintiffs allege that James and Marshburn conspired to plunder McKee Craft of its assets, transfer the assets to Coconut Holdings, and eliminate Plaintiffs as shareholders and creditors. (V. 2nd Am. Compl. ¶¶ 67, 146, 151–52.)

III.

STANDARD OF REVIEW

{31}    The question for the court on a motion to dismiss is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank of North Carolina*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987) (citing *Stanback v. Stanback*, 297 N.C. 181, 185, 254 S.E.2d 611, 615 (1979)).

{32}    "The complaint must be liberally construed, and the court should not dismiss the complaint unless it appears beyond a doubt that the plaintiff could not prove any set of facts to support his claim which would entitle him to relief." *Block v. County of Person*, 141 N.C. App. 273, 277–78, 540 S.E.2d 415, 419 (2000) (citation omitted). When the complaint fails to allege the substantive elements of some legally cognizable claim, or where it alleges facts that defeat the claim, the complaint should be dismissed under Rule 12(b)(6). *See Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 345–46, 511 S.E.2d 309, 312 (1999).

{33}    While factual allegations must be accepted as true on a motion to dismiss, bare legal conclusions are "not entitled to a presumption of truth." *Miller v. Rose*, 138 N.C. App. 582, 592, 532 S.E.2d 228, 235 (2000). Further, the Court is mindful that averments of fraud must be pled specifically and with particularity. N.C. R. Civ. P. 9(b).

IV.

ANALYSIS

A.

BREACH OF CONTRACT (DIRECT)

{34}   To establish a *prima facie* case for breach of contract, a plaintiff must show: "(1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 16, 25, 530 S.E.2d 838, 843 (2000).

{35}   James argues no valid contract exists with Plaintiffs because the two written contracts at issue in this case, the First and Second Purchase Agreements, bound James only to McKee Craft.[5]  However, Plaintiffs also allege that James made several oral promises directly to them that were not reflected in the First and Second Purchase Agreements.  Specifically, Plaintiffs allege that James made certain promises to them in exchange for Plaintiffs giving up portions of their ownership interests in McKee Craft.  The question for the Court to resolve is whether these oral promises survived as binding agreements between James and Plaintiffs notwithstanding the express terms of the First and Second Purchase Agreements.

{36}   James points out that the written contracts do not mention the oral promises he allegedly made to Plaintiffs, beyond his promise to pay $300,000 to McKee Craft.  Furthermore, the First and Second Purchase Agreements contain merger clauses that expressly nullify extraneous agreements not reflected in the written contracts.  (James' Mot. Dismiss Ex. B § 8(b), Ex. C § 6(b).)

{37}   "[M]erger clauses were designed to effectuate the policies of the Parol Evidence Rule; i.e., barring the admission of prior and contemporaneous negotiations on terms inconsistent with the terms of the writing." *Zinn v. Walker*, 87 N.C. App. 325, 333, 361 S.E.2d 314, 318 (1987).  "Merger clauses create a rebuttable presumption that the writing represents the final agreement between the parties." *Id.*  However, this presumption may be rebutted where the claimant pleads "the existence of fraud, unconscionability, negligent omission or mistake of

[5] The Court notes, however, that McKee is a party to the First Purchase Agreement.

fact" in the creation of the contract, or "[w]here giving effect to the merger clause would frustrate and distort the parties' true intentions and understanding . . . ." *Id.*

{38} As discussed more fully below, Plaintiffs allege that James defrauded them into signing the contracts on behalf of McKee Craft, thus calling into question the validity of the entire agreement. (V. 2nd Am. Compl. ¶ 123.) Plaintiffs also argue that giving effect to the merger clause would distort the parties' true intentions. Accepting Plaintiffs' allegations as true, at this stage of litigation, the merger clause will not operate to foreclose consideration of oral promises that James allegedly made to Plaintiffs to induce Plaintiffs to sign the First and Second Purchase Agreements. Therefore, the Court concludes that Plaintiffs have stated a claim for breach of contract.

{39} Accordingly, Defendant James' motion to dismiss Plaintiffs' breach of contract claim is **DENIED**.

B.

BREACH OF FIDUCIARY DUTY (DIRECT)

{40} Plaintiffs bring this claim both individually, as shareholders in McKee Craft, and derivatively on behalf of McKee Craft. However, James only moved to dismiss the individual claim, arguing that Plaintiffs lack standing to assert this claim individually.[6] (James' Br. Supp. Mot. Dismiss 9.)

{41} "As a general rule, shareholders have no right to bring actions 'in their [individual] names to enforce causes of action accruing to the corporation' . . . ." *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 395, 537 S.E.2d 248, 253 (2000) (quoting *Fulton v. Talbert*, 255 N.C. 183, 185, 120 S.E.2d 410, 412 (1961)). However, there are two recognized exceptions to this general rule: "(1) where there is a special duty . . . between the wrongdoer and the shareholder, and (2) where the shareholder suffered an injury separate and distinct from that

---

[6] Although "[s]tanding . . . is . . . properly challenged by a Rule 12(b)(1) motion to dismiss," *Fuller v. Easley*, 145 N.C. App. 391, 395, 553 S.E.2d 43, 46 (2001), "[a] lack of standing may be challenged by motion to dismiss for failure to state a claim upon which relief may be granted. *Energy Investors Fund, L.P. v. Metric Constructors Inc.*, 351 N.C. 331, 337, 525 S.E.2d 441, 445 (2000).

suffered by other shareholders." *Barger v. McCoy Hillard & Parks* , 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997) (citations omitted).

{42} In *Norman*, the Court of Appeals appeared to establish an additional exception in the context of closely-held companies, noting that the powerlessness of minority shareholders in closely-held entities justifies granting them the ability to sue majority shareholders directly.[7] *See Norman*, 140 N.C. App. 390, 537 S.E.2d 248. However, the court later clarified its ruling in *Norman* by concluding that *Norman*'s analysis of closely-held companies did not establish a third exception under *Barger* but rather provided "tools . . . to determine if a special duty or distinct injury exists." *Gaskin v. J.S. Procter Co., LLC*, 196 N.C. App. 447, 453, 675 S.E.2d 115, 119 (2009).

{43} Indeed, Plaintiffs concede that they must fall under one of the two exceptions outlined in *Barger* to be able to sue James directly for breach of fiduciary duty. (Pls.' Resp. Opp. Mot. Dismiss 6–7.) However, Plaintiffs argue that they have alleged facts sufficient to support both exceptions.

{44} "The existence of a special duty . . . [is] established by facts showing that defendants owed a duty to plaintiffs that was personal to plaintiffs as shareholders and [] separate and distinct from the duty defendants owed the corporation." *Barger*, 346 N.C. at 659, 488 S.E.2d at 220. A special duty may run from majority shareholders to minority shareholders of a closely-held corporation when the minority shareholders occupy a position of powerlessness within the company, as determined by the following factors:

> (1) the difficulty faced by minority shareholders in dissolving the entity, either because of legal impediments to dissolving the corporation or because of the complex relationships involved in a

---

[7] A closely-held corporation is defined as follows:

> [A] corporate entity typically organized by an individual, or a group of individuals, seeking the recognized advantages of incorporation, limited liability, perpetual existence and easy transferability of interests—but regarding themselves basically as partners and seeking veto powers as among themselves much more akin to the partnership relation than to the statutory scheme of representative corporate government.

*Meiselman v. Meiselman*, 309 N.C. 279, 289, 307 S.E.2d 551, 557 (1983).

family business; and (2) whether the recovery would be left in control of the alleged wrongdoers.

*Gaskin*, 196 N.C. App. at 453, 675 S.E.2d at 119 (citing *Norman*, 140 N.C. App. at 404–05, 537 S.E.2d at 258–59.)  However, in finding such a special duty, the court should also "consider the potential impact of a direct or individual lawsuit on third-party creditors, and the potential impact of such a suit on the legal system, i.e., danger of multiple lawsuits . . . ."  *Gaskin*, 196 N.C. App. at 454, 675 S.E.2d at 119.

{45}  Here, Plaintiffs argue that James owed them a special duty by virtue of their "longstanding personal relationship," (V. 2nd Am. Compl. ¶ 116), and the special confidence and trust placed in James by allowing him to become a majority shareholder in their closely-held family business.  (V. 2nd Am. Compl. ¶¶ 113, 115.)  Although Plaintiffs argue that their "longstanding personal relationship" with James led them to place trust in him, the Court finds this argument unavailing.  From the allegations in the Complaint, it appears that Plaintiffs only knew James for approximately four months prior to entering the First Purchase Agreement.  (V. 2nd Am. Compl. ¶¶ 19, 36, 116.)  However, after entering the Second Purchase Agreement, James had majority control of McKee Craft (88.65 %), (James' Mot. Dismiss Ex. C Ex. A.), and, therefore, could assert total control over the minority shareholders.

{46}  Furthermore, based on the allegations, it appears that McKee Craft is a closely-held family business.  Even though James is not a member of the McKee family, Plaintiffs argue that the familial history of the company made dissolution difficult.  And, given James' majority interest, any recovery for the company would be left in James' control, rendering Plaintiffs powerless in directing the management and affairs of McKee Craft.  Taking the allegations as true, the Court concludes, therefore, that Plaintiffs have sufficiently alleged a special duty owed to them by James as the majority shareholder in McKee Craft.  And, while the impact of a direct lawsuit on the creditors of McKee Craft and the danger of additional

lawsuits cause the Court some concern, the Court will not bar Plaintiffs' direct claims at this point based upon the facts before it.[8]

{47}    Accordingly, the Court concludes that Plaintiffs have alleged sufficient facts to withstand dismissal of their direct cause of action for breach of fiduciary duty.  The Court, therefore, **DENIES** the Motion with respect to this claim.

C.

FRAUD (DIRECT)

{48}    To state a claim for fraud, a plaintiff must allege that a defendant made a "(1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, and (5) resulting in damage to the injured party."  *Harrold v. Dowd*, 149 N.C. App. 777, 782, 561 S.E.2d 914, 918 (2002) (citing *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974)).  Pursuant to Rule 9(b) of the North Carolina Rules of Civil Procedure, all averments of fraud must be pled with particularity.  N.C. R. Civ. P. 9(b).

{49}    "A claim for fraud may be based on an 'affirmative misrepresentation of a material fact, or a failure to disclose a material fact relating to a transaction which the parties had a duty to disclose.'"  *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696, 682 S.E.2d 726, 733 (2009) (quoting *Harton v. Harton*, 81 N.C. App. 295, 297, 344 S.E.2d 117, 119 (1986)).  Here, Plaintiffs alleged both affirmative misrepresentations and a failure to disclose material facts by Defendants.

1.

FRAUDULENT CONCEALMENT

{50}    "Fraudulent concealment or fraud by omission is, by its very nature, difficult to plead with particularity."  *Lawrence v. UMLIC–Five Corp.*, 2007 NCBC 20 ¶ 39 (N.C. Super. Ct. June 18, 2007), http://www.ncbusinesscourt.net/opinions

---

[8] Even if Plaintiffs failed to establish a special duty owed to them, the allegations also reveal a separate and distinct injury.  Specifically, Plaintiffs allege that, in addition to the injuries they sustained as shareholders, they also lost their positions as managers and officers of the company. (V. 2nd Am. Compl. ¶ 117.)

/2007_NCBC_20.pdf (citing *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195–96 (M.D.N.C. 1997)). Specifically, a plaintiff must allege:

> (1) the relationship [between plaintiff and defendant] giving rise to the duty to speak; (2) the event or events triggering the duty to speak and/or the general time period over which the relationship arose and the fraudulent conduct occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what [the defendant] gained by withholding information; (6) why plaintiff's reliance on the omission was both reasonable and detrimental; and (7) the damages proximately flowing from such reliance.

*Lawrence*, 2007 NCBC 20 ¶ 39 (adopting *Breeden*, 171 F.R.D. 189, 195–96 (M.D.N.C. 1997) (citations omitted).

{51}   A duty to speak may arise: (1) in the context of a fiduciary relationship, (2) where "a party has taken affirmative steps to conceal material facts from the other," or (3) "where one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence." *Harton*, 81 N.C. App. at 297–98, 344 S.E.2d at 119.

{52}   James argues that Plaintiffs failed to allege that a duty to speak existed at the time of the concealment, and did not plead this claim with sufficient particularity. (Def.'s Br. Supp. 2d Mot. Dismiss 17.) The Court agrees.

{53}   Plaintiffs contend that James concealed material facts from them to induce them to enter the First and Second Purchase Agreements. As such, Plaintiffs must allege that a duty to speak existed prior to the Second Purchase Agreement. Here, Plaintiffs argue that James' duty to speak arose out of the fiduciary relationship created by virtue of their positions as shareholders in McKee Craft and during their long-standing personal relationship. However, the allegations do not support the existence of a fiduciary duty between the parties prior to either the First or Second Purchase Agreement.

{54}   At the outset, the Court notes that the facts as alleged do not suggest the existence of a long-standing relationship at the time of the alleged concealment

that would serve to impose fiduciary duties upon James. According to Plaintiffs, James initially approached them only four months prior to entering the deal to invest in McKee Craft. (V. 2nd Am. Compl. ¶¶ 19, 36, 116.)

{55} Additionally, any fiduciary duty arising out of the parties' relationship as shareholders would not have existed prior to the Second Purchase Agreement under which James became a majority shareholder. "As a general rule, shareholders do not owe a fiduciary duty to each other or to the corporation." *Freese v. Smith*, 110 N.C. App. 28, 37, 428 S.E.2d 841, 847 (1993). A controlling shareholder's fiduciary duty to minority shareholders is a recognized exception to this general rule. *Id.* However, prior to the Second Purchase Agreement, James only maintained a minority interest in McKee Craft. Therefore, the Court concludes that no fiduciary duty existed at the time of the alleged concealment.

{56} Assuming, for the sake of argument, that James had a duty to speak, it does not appear that Plaintiffs alleged with any particularity the content of the information withheld or concealed. The allegations of fraud all speak to affirmative misrepresentations, but neglect to clarify what information James purportedly concealed from them. (V. 2nd Am. Compl. ¶ 124.) The Court concludes, therefore, that Plaintiffs have failed to allege their claim for fraudulent concealment with sufficient particularity to survive a motion to dismiss.

{57} Accordingly, the Court hereby **GRANTS** the Motion with respect to Plaintiffs' claim for fraudulent concealment.

2.

AFFIRMATIVE MISREPRESENTATION

{58} In the Motion, James first argues that this claim should be dismissed because Plaintiffs failed to plead fraud with particularity. To sufficiently plead a claim for fraud based on affirmative misrepresentations, the plaintiff must allege with particularity the "'time, place and content of the fraudulent misrepresentation, identity of the person making the representation and what was obtained as a result of the fraudulent act or representations.'" *Harrold*, 149 N.C. App. at 782, 561 S.E.2d at 918 (quoting *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981)).

However, "[m]alice, intent, knowledge, and other condition of mind . . . may be averred generally." N.C. R. Civ. P. 9(b).

{59} In the Complaint, Plaintiffs enumerate several affirmative representations that they allege James made during negotiations in the months prior to entering the written agreements, which support their claim for fraud. (V. 2nd Am. Compl. ¶ 124(a)–(p).) The Court concludes that these allegations are sufficiently particular to put James on notice of the fraud claims against him.[9]

{60} James next argues that Plaintiffs' claim fails because the alleged misrepresentations were all promises of future performance. "As a general rule, a mere promissory representation will not support an action for fraud." *Braun v. Glade Valley Sch., Inc.*, 77 N.C. App 83, 87, 334 S.E.2d 404, 407 (1985). "However, a promissory misrepresentation may constitute actual fraud if the misrepresentation is made with intent to deceive and with no intent to comply with the stated promise or representation." *Id.*

{61} Plaintiffs contend James' representations were false at the time he made them and were made with intent to deceive the Plaintiffs. (V. 2nd Am. Compl. ¶¶ 58, 126.) To support this allegation and the argument that James never intended to comply with his promises, Plaintiffs point to James' alleged actions immediately following the second transfer of shares, including removing Plaintiffs as employees and officers, informing government purchasers their orders would not be filled, directing staff to stop honoring customer warranty claims, and failing to pay legal obligations of the company. (V. 2nd Am. Compl. ¶¶ 63–66, 117(c), (e), (g).) Accepting the allegations as true, the Court concludes that, although certain

---

[9] Although Plaintiffs do not allege the exact place where James made each of these representations, the Court does not conclude that this is a material omission justifying dismissal. To meet the particularity requirement, courts do not require "perfect and complete specificity." *Hudgins v. Wagoner*, 204 N.C. App. 480, 487, 694 S.E.2d 436, 443 (2010) (holding that plaintiff's failure to plead the exact "place" where the misrepresentation was made did not defeat the claim). Thus, based on a liberal construction of the Complaint, the Court concludes that Plaintiffs alleged sufficient facts to inform James of the allegations brought against him.

representations constituted promises of future performance, Plaintiffs have sufficiently alleged James' intent to deceive and not comply with his promises.[10]

{62} Lastly, James argues that Plaintiffs could not have reasonably relied on any alleged misrepresentations because the merger clauses in the First and Second Purchase Agreements rendered any reliance unreasonable as a matter of law. (James' Br. Supp. Mot. Dismiss 16–17.)

{63} To survive a motion to dismiss, Plaintiffs must allege all of the elements of fraud, including Plaintiffs' reasonable reliance on the misrepresentations. *See Foley v. L & L Int'l, Inc.*, 88 N.C. App. 710, 715, 364 S.E.2d 733, 736 (1988) (citation omitted). And, "when the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999).

{64} Here, it is unlikely that Plaintiffs could have discovered through inquiry that James did not intend to follow through on the promises he allegedly made to Plaintiffs, as such inquiry would require discerning James' intent at the time. However, James argues that the merger clauses in the First and Second Purchase Agreements, which expressly provide that the written agreements contained the entire agreement between the parties, made Plaintiffs' reliance on these alleged oral promises unreasonable. (James' Mot. Dismiss Ex. B § 8(b), Ex. C § 6(b).)

{65} As noted above, a merger clause generally excludes the admission into evidence of prior representations and agreements between the parties inconsistent with the terms of the written contract. *Zinn*, 87 N.C. App. at 333, 361 S.E.2d at 318. However, "[w]here a contract or transaction is induced by misrepresentations, the fraud and the contract are 'distinct and separable -- that is, the representations

---

[10] The Court also notes that a few of the representations alleged by Plaintiffs do not constitute promises of future performance but representations of present facts, including James' representations regarding his business expertise and experience. (V. 2nd Am. Compl. ¶ 124.)

are usually not regarded as merged in the contract.'" *Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 78, 598 S.E.2d 396, 403 (2004) (citing *Fox v. S. Appliances*, 264 N.C. 267, 270, 141 S.E.2d 522, 525 (1965)) (quotation and citation omitted).

{66}    In this case, Plaintiffs claim that the alleged misrepresentations induced them to enter the written agreements with James.  (V. 2nd Am. Compl. ¶ 125.)  Therefore, the representations are separable from the contracts, and the merger clauses will not invalidate Plaintiffs' assertion of reliance on James' prior oral representations at this stage.  (V. 2nd Am. Compl. ¶ 128.)  As such, the Court concludes that Plaintiffs have sufficiently alleged a claim for fraud based on affirmative misrepresentations.

{67}    Accordingly, the Court hereby **DENIES** the Motion with respect to Plaintiffs' claim for fraud based upon affirmative misrepresentations.

D.

UNFAIR AND DECEPTIVE TRADE PRACTICES (DIRECT)

{68}    To properly state a claim for unfair and deceptive trade practices, a plaintiff must allege "(1) defendant committed an unfair and deceptive act or practice, (2) in or affecting commerce, and (3) plaintiff was injured as a result." *Phelps-Dickson Builders, LLC v. Amerimann Partners*, 172 N.C. App. 427, 439, 617 S.E.2d 664, 671 (2005) (citing *Edwards v. West*, 128 N.C. App. 570, 574, 495 S.E.2d 920, 923 (1998)).

{69}    James argues that Plaintiffs' claim fails because the conduct giving rise to the claim was not "in or affecting commerce."  (Def.'s Br. Supp. 2d Mot. Dismiss 18–19.)

{70}    Under the Unfair and Deceptive Trade Practices Act ("UDTPA"), the term "'commerce' includes all business activities, however denominated." N.C. GEN. STAT. § 75–1.1(b) (2013).  The North Carolina Supreme Court has interpreted "business activities" to mean "the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594, 403

S.E.2d 483, 493 (1991). However, the UDTPA does not apply to matters of internal corporate governance, *see Wilson v. Blue Ridge Elec. M'ship. Corp.*, 157 N.C. App. 355, 358, 578 S.E.2d 692, 694 (2003), or to securities transactions. *HAJMM Co.*, 328 N.C. App. at 593, 403 S.E.2d at 492.

{71} Although many of Plaintiffs' allegations in the Complaint relate to the internal dispute between the shareholders and the sale of stock in McKee Craft, Plaintiffs also allege other actions as the basis of their claims, including that James improperly (1) informed government purchasers that their orders would not be filled, (2) directed staff to stop honoring warranty claims of the corporation, (3) sold or gave away boats already manufactured for other entities, and (4) auctioned the molds and plugs used to build boats to Coconut Holdings "for less than reasonable or fair market value." (V. 2nd Am. Compl. ¶¶ 64–65, 72, 151.) These allegations fall outside of the internal dispute and stock sale, and involve interactions with other commercial businesses. Therefore, accepting the allegations as true, the Court concludes that James' alleged acts were "in or affecting commerce." Furthermore, because these acts partially form the basis for Plaintiffs' underlying tort claims and, thus, may offend established public policy, *see Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981), the Court concludes that Plaintiffs have sufficiently pled a claim for unfair and deceptive trade practices.

{72} Accordingly, Defendant James' motion to dismiss Plaintiffs' unfair and deceptive trade practices claim is **DENIED**.

E.

LIBEL/SLANDER (DIRECT)

{73} To recover for libel or slander, "a plaintiff must allege that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Holleman v. Aiken*, 193 N.C. App. 484, 495, 668 S.E.2d 579, 587 (2008). To be actionable, "the words attributed to defendant [must] be alleged . . . with sufficient particularity." *Stutts v. Duke Power*, 47 N.C. App. 76, 84, 266 S.E.2d 861, 866 (1980). While the plaintiff need not quote the exact words communicated by the defendant in his

complaint, the allegations must describe at least the substance of the statement. *Id.*

{74} Here, Plaintiffs merely allege that James "made oral and written statements to persons in the boat industry that were false and derogatory towards Plaintiffs." (V. 2nd Am. Compl. ¶ 83.) The Complaint is devoid of any specific allegations as to the substance or context of such statements. Without such, Plaintiffs' claim fails as a matter of law.

{75} Accordingly, the Court **GRANTS** the Motion as to Plaintiffs' claim for libel/slander. Plaintiffs' claim for libel/slander is hereby **DISMISSED** with prejudice.

F.

CIVIL CONSPIRACY (DIRECT & DERIVATIVE)

{76} It is well recognized that "there is not a separate civil action for civil conspiracy in North Carolina." *Dove v. Harvey*, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005), *disc. rev. denied*, 360 N.C. 289, 628 S.E.2d 249 (2006) (citing *Shope v. Boyer*, 268 N.C. 401, 150 S.E.2d 771 (1966)). However, the plaintiff may assert a civil conspiracy to "associate the defendants together [such that] the acts and conduct of one might be admissible against all." *Id.* (quoting *Fox v. Wilson*, 85 N.C. App. 292, 300, 354 S.E.2d 737, 742–43 (1987)).

{77} "An action for civil conspiracy will lie when there is an agreement between two or more individuals to do an unlawful act or to do a lawful act in an unlawful way, resulting in injury inflicted by one or more of the conspirators pursuant to a common scheme." *Jones v. City of Greensboro*, 51 N.C. App. 571, 583, 277 S.E.2d 562, 571 (1981) (quotation and citation omitted), *overruled on other grounds by Fowler v. Valencourt*, 334 N.C. 345, 435 S.E.2d 530 (1993).

{78} James argues that Plaintiffs' direct and derivative claim for civil conspiracy should be dismissed because Plaintiffs failed to allege an agreement between Defendants, and relied on the same acts to form the basis of the conspiracy claims as the tort claims. (James' Br. Supp. Mot. Dismiss 19–20.)

{79}    Here, Plaintiffs alleged that Defendants planned and schemed to take Plaintiffs' property and close down McKee Craft.  (V. 2nd Am. Compl. ¶¶ 162–64.) And, in furtherance of that plan, Plaintiffs allege that Defendants committed various acts as set forth in the Complaint.  Although Plaintiffs never specifically use the term "agree," the Court construes the allegations liberally, and concludes that these allegations suffice to aver an agreement to a common scheme.

{80}    James' remaining argument is equally unavailing.  While the court in *Jones* held that the plaintiff could not "use the same alleged acts to form both the basis of a claim for conspiracy to commit certain torts *and* the basis of claims for those torts," 51 N.C. App. at 584, 277 S.E. 2d at 571, the court later distinguished this case in *Norman* on a motion to dismiss.  In *Norman*, the court held that, although *Jones* upheld dismissal of the action for conspiracy at the summary judgment stage, dismissal on the same grounds at the 12(b)(6) stage was inappropriate since plaintiffs may plead alternative theories of recovery.  *Norman*, 140 N.C. App. at 416, 537 S.E.2d at 265.  As such, the Court concludes that Plaintiffs have adequately stated a claim for conspiracy, and may proceed under this theory at this stage of the litigation.

{81}    Accordingly, the Court hereby **DENIES** the Motion as to Plaintiffs' direct and derivative claim for conspiracy.

G.

MISAPPROPRIATION OF TRADE SECRETS (DERIVATIVE)

{82}    The Trade Secret Protection Act ("TSPA"), under which Plaintiffs bring this claim, provides a cause of action for the misappropriation of a trade secret. N.C. GEN. STAT. § 66-153 (2013).  "Misappropriation" is defined under the TSPA as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret."  § 66-152(1).  The TSPA defines a "trade secret" as

business or technical information . . . that: (a.) [d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and (b.) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

§ 66-152(3).

{83}   "To plead misappropriation of trade secrets, 'a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur.'" *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 510–11, 606 S.E.2d 359, 364 (2004); *see also Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003).   In doing so, Plaintiffs must allege the reasonable efforts taken to maintain the secrecy of the information. *Thortex, Inc. v. Std. Dyes, Inc.*, No. COA05–1274, 2006 N.C. App. LEXIS 1171  at *9–*10 (N.C. Ct. App. 2006).  "[T]he mere assertion that [trade secrets] were kept confidential is not enough to withstand a 12(b)(6) motion to dismiss." *Id.*

{84}   Here, James argues that Plaintiffs failed to allege a trade secret with sufficient particularity, and, more specifically, did not allege reasonable efforts to maintain its secrecy.  Plaintiffs allege that the method of construction of McKee Craft vessels constitutes a trade secret, and particularly state the method and its benefits. (V. 2nd Am. Compl. ¶¶ 14–18.)  These allegations sufficiently identify what Plaintiffs believe constitutes the trade secret.  However, there are no allegations outlining the reasonable measures Plaintiffs relied on to maintain the secrecy of their construction methods.  While Plaintiffs allege that James had access to trade secrets, the only allegation mentioning the protection of any confidential information states that James received "full administrative access to Quickbooks via a password." (V. 2nd Am. Compl. ¶¶ 59–60.)  At most, Plaintiffs have alleged that the financial records of McKee Craft may have been protected by a password.  However, Plaintiffs failed to allege any facts tending to demonstrate that Plaintiffs implemented reasonable efforts to protect the secrecy of the construction methods.

Thus, the Court concludes that Plaintiffs have not sufficiently alleged the existence of a trade secret, as it is contemplated under the TSPA, and thus, Plaintiffs' claim fails as a matter of law.

{85} Accordingly, the Court hereby **GRANTS** the Motion as to Plaintiffs' claim for misappropriation of trade secrets. Plaintiffs' claim for misappropriation of trade secrets is **DISMISSED** with prejudice.

H.

FRAUDULENT TRANSFER (DERIVATIVE)

{86} Fraudulent transfers or conveyances are governed by the Uniform Fraudulent Transfer Act ("UFTA"). N.C. GEN. STAT. § 39-3A (2013). The UFTA allows a creditor to bring a civil action against a debtor for certain transfers made by the debtor. § 39-23.7. Specifically, the UFTA provides that a transfer is fraudulent as to present and future creditors if the debtor made the transfer:

> (1) with intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

§ 39-23.4(a).

{87} The statute also grants present creditors an additional ground to challenge a transfer where the debtor made the transfer without receiving a reasonably equivalent value in exchange, and the debtor was insolvent at the time or became insolvent as a result. § 39-23.5(a). The UFTA, thus, contemplates a debtor-creditor relationship between the parties, and defines a "creditor" as a person who has a "right to payment" from the debtor. § 39-23.1(3),(4),(6). Furthermore, the statute defines a "transfer" as "every mode . . . of disposing of or parting with" property belonging to the debtor. § 39-23.1(2),(12). Thus, to state a claim under the UFTA, the plaintiff must allege a right of payment from the

defendant, and a transfer made by the defendant of the defendant's own property in a such a way as to fall under either § 39-23.4(a) or § 39-23.5(a).

{88}   Here, Plaintiffs argue that McKee Craft retained a right of payment for assets James transferred to other entities or converted for his own use. However, Plaintiffs base their entire claim on James' transfer of McKee Craft's property. (V. 2nd Am. Compl. ¶¶ 145–55.) Plaintiffs have not directed the Court to any allegations that James transferred his own property to avoid a debt he owes McKee Craft, as required under the UFTA. § 39-23.1(2),(12). While James' alleged conversion and transfer of McKee Craft's assets may entitle McKee Craft to recovery under some cognizable claim, the Court concludes that Plaintiffs' allegations do not give rise to a claim under the UFTA.

{89}   Accordingly, James' motion to dismiss Plaintiffs' claim based on the fraudulent transfer of assets to avoid creditors is **GRANTED**.   Plaintiffs' claim for fraudulent transfer is hereby **DISMISSED** with prejudice.

I.

CORPORATE WASTE (DERIVATIVE)

{90}   Plaintiffs attempt to bring a separate claim for corporate waste. However, as argued by James, North Carolina does not appear to recognize such a claim as a separate cause of action. Rather, a claim for corporate waste would be subsumed in Plaintiffs' derivative claims for breach of fiduciary duty and gross mismanagement. *See Green v. Condra*, 2009 NCBC 21 ¶ 127–28 (N.C. Super. Ct. Aug. 14, 2009), http://www. ncbusinesscourt.net/opinions/2009_NCBC_21 .pdf (dismissing a claim for corporate waste because it was encompassed in claims for breach of fiduciary duty, gross mismanagement, and constructive fraud). Thus, "it would serve no purpose to allow Plaintiffs leave to restate the claims." *Id.* at ¶ 130. Indeed, Plaintiffs admit that this claim would fall under their other derivative claims. (Pls.' Resp. Opp. Mot. Dismiss 20.)

{91}   Accordingly, James' Motion as to Plaintiffs' corporate waste claim is **GRANTED**. Plaintiffs' derivative claim for corporate waste is **DISMISSED** with prejudice.

J.

PUNITIVE DAMAGES

{92}    To prevail on a claim for punitive damages, Plaintiffs must succeed on a claim for compensatory damages, and prove by clear and convincing evidence that one or more of the following aggravating factors were present: (a) fraud, (b) malice, or (c) willful or wanton conduct.  N.C. GEN. STAT. § 1D-15 (2013); *see also Sellers v. Morton*, 191 N.C. App. 75, 85, 661 S.E.2d 915, 923 (2008).  Because the Court concludes that Plaintiffs have sufficiently pled claims for compensatory damages, James' motion to dismiss Plaintiffs' punitive damages claim is **DENIED**.

V.

CONCLUSION

{93}    For the reasons stated above, the Court **GRANTS** James' Motion to Dismiss with respect to Plaintiffs' direct claims for libel/slander and fraud based on the theory of fraudulent concealment, and with respect to Plaintiffs' derivative claims for misappropriation of trade secrets, fraudulent transfer, and corporate waste.  All other requests for relief in the Motion are **DENIED**.

{94}    Accordingly, the Court hereby **DISMISSES** with prejudice Plaintiffs' direct claims for libel/slander and fraud based on the theory of fraudulent concealment, and **DISMISSES** with prejudice Plaintiffs' derivative claims for misappropriation of trade secrets, fraudulent transfer, and corporate waste.

**SO ORDERED**, this is the 24th day of July 2013.