McKee v. James, 2014 NCBC 73.

STATE OF NORTH CAROLINA

COUNTY OF ROBESON

LANNESS K. McKEE and LANNESS
K. McKEE, JR.,

Plaintiffs,

v.

HUNTINGTON JAMES, JOHNNIE
MARSHBURN, and COCONUT
HOLDINGS, LLC,

Defendants,

v.

LANNESS K. McKEE & COMPANY,
INC.,

Nominal Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 3031

ORDER AND OPINION

{1}     **THIS MATTER** is before the Court upon Defendant Huntington James's ("James") Motion for Summary Judgment, Defendant Coconut Holdings, LLC's ("Coconut Holdings") Motion for Summary Judgment, and James's Motion to Exclude Plaintiffs' Expert Witnesses' Affidavits and Testimony ("Motion to Exclude Expert Testimony") (collectively, the "Motions").

{2}     The Court, having considered the Motions, affidavits and supporting briefs, as well as the arguments of counsel at the September 25, 2014 hearing in this matter, hereby **GRANTS** James's Motion for Summary Judgment, **GRANTS** Coconut Holdings's Motion for Summary Judgment, and, in light of these rulings, **DENIES** as moot James's Motion to Exclude Expert Testimony.

*Brazil & Dunn, by K. Scott Brazil and Chad W. Dunn, and The Foster Law Firm, P.A., by Jeffrey B. Foster, for Plaintiffs.*

*Poyner Spruill, LLP, by Joshua B. Durham and Jason B. James, for Defendant Huntington James.*

*Bell, Davis & Pitt, P.A., by Edward B. Davis and Andrew A. Freeman, for Defendant Coconut Holdings, LLC.*

Bledsoe, Judge.

I.

BACKGROUND

{3}     The facts and procedural background of this case are recited in detail in *McKee v. James*, 2013 NCBC 38 (N.C. Super. Ct., July 24, 2013), http://www.ncbusinesscourt.net/opinions/2013_NCBC_38.pdf.   The pertinent background for purposes of resolving the present Motions is set forth below.

{4}     Plaintiff Lanness K. McKee ("Lanness") formed Lanness K. McKee & Co., Inc. ("McKee Craft" or "the Company"), a Fairmont, North Carolina-based company, more than forty years ago "for the purpose of building top-of-the-line boats for government and recreational use."  (Compl. ¶ 8.)  Lanness's son, Plaintiff Lanness K. McKee, Jr. ("Key"), later joined McKee Craft and became its President in 1989. (Lanness Dep. 66:14–68:3, Mar. 16, 2011.)

{5}     For decades, McKee Craft serviced a broad client base, comprised of businesses, government agencies, and recreational boaters, and was a well-respected brand in the boating industry.  (Compl. ¶¶ 10, 12; Marshburn Dep. 16:20–25, Sept. 15, 2010.)  The Company was known for producing "unsinkable

boats" through use of a unique "pressure foam filled construction" design. (Compl. ¶¶ 14—16.)

{6}     In early 2007, James contacted McKee Craft seeking an "unsinkable" boat for his personal use. (Compl. ¶ 19.) When McKee Craft agreed to build his boat as requested, James remarked that he was glad he would not need to take the "drastic step" of buying his own boat manufacturer to construct a suitable boat. (Pls.' Ex. 4.)

{7}     McKee Craft's financial condition had begun to deteriorate in the years preceding James's initial contact with the Company. Though Company sales peaked at approximately $9.2 million in 2004, sales thereafter decreased each year from 2005 to 2007. (Pls.' Ex. 14.). McKee Craft was also short on cash, a problem that caused it to fall behind on its payments to vendors, who in turn began to withhold parts and materials critical to the Company's operations, thereby hindering the Company's production and thus contributing to a growing backlog of orders.[1] (Key Dep. 79:23–25, Oct.14—15, 2013; Pls.' Ex. 13.[2]). The Company's cash flow problems ultimately forced it to halt production of James's boat in February 2007. (James Aff. ¶ 4.)

{8}     Soon thereafter, in April 2007, James and Key began discussing the possibility of James making a cash contribution to McKee Craft in exchange

[1] Plaintiffs attribute McKee Craft's cash flow problems to the Company's "unprecedented sales" prior to James's engagement with the Company. (Compl. ¶ 20; Pls.' Br. Opp. James Mot. S.J., p. 4.) This assertion is directly contradicted by Key's deposition testimony that sales declined in 2005, 2006 and 2007. (Key Dep. 44:1–46:6.)

[2] Plaintiffs' Exhibit 13 sets forth thirty-two (32) of McKee Craft's "Known Problems & Issues" as of August 2007.

for an ownership interest in the Company. (James Aff. ¶ 5.) James reviewed McKee Craft's financial statements, signing a Confidentiality Agreement in the process (Pls.' Ex. 6.), and visited the Company's facilities, taking notes that included: "How much would it cost to start from scratch?" (Pls.' Ex. 3.)

{9} In an email to Key dated April 18, 2007, James outlined three "options" for them to explore: (i) James could "simply pay McKee Craft to build the boat that [he wanted] and then go on [his] way"; (ii) James could start his own boating company and pay McKee Craft to build boats for his new company; or (iii) James could "purchase a portion or all of the company's shares or make an 'investment' by personally guaranteeing the company's debts so that the banks would leave the company alone and give it time to pay off those balances." (Pls.' Ex. 5.)

{10} On May 30, 2007, the parties executed a Temporary Share Purchase Agreement ("TSPA"), which provided that James would make a $300,000 equity investment in McKee Craft by May 31, 2008 in exchange for an approximate 20% stake in the Company.[3] (Compl. ¶ 35; Pls.' Ex. 9.). Rather than delay his investment for up to a year as permitted under the TSPA, James provided the full $300,000 contribution on the effective date of the TSPA (*i.e.*,

---

[3] Prior to execution of the TSPA, all of McKee Craft's stock was held by Plaintiffs and other members of the McKee family. (Pls.' Ex. 9.)

May 30, 2007),[4] and McKee Craft used the funds to pay its vendors. (Key Dep. 205:16–215:4.)

{11} As contemplated in the TSPA, the parties subsequently executed a Common Stock Purchase Agreement ("CSPA I"), a more detailed agreement concerning James's investment and ownership interest in McKee Craft, on August 6, 2007.[5] (Pls.' Ex. 104) The parties were represented by counsel in negotiating CSPA I, which included a merger clause specifying that CSPA I represented "the entire agreement and understanding of the parties relating to the subject matter [t]herein and merge[d] all prior discussions and agreements between them, including the [TSPA]." (Frazier Aff. ¶ 3; Pls.' Ex. 104, p. 14.)

{12} Notwithstanding James's initial investment, McKee Craft's cash flow problems persisted, prompting James to extend numerous loans to McKee Craft in an attempt to keep the Company afloat. (James Aff. ¶ 21.) The undisputed evidence shows that James loaned the Company $78,000.00 on June 19, 2007; $50,000.00 on August 7, 2007; $48,000.00 on August 17, 2007; $124,000.00 on August 24, 2007; $10,000.00 on November 27, 2007; and $50,000.00 on January 10, 2008. (James Aff. ¶ 21, p. 60, 186–90.)

---

[4] Because of the company's immediate need for cash, James provided $50,000 of the $300,000 to McKee Craft on May 23, 2007, prior to execution of the TSPA (James Aff. ¶ 9.), and the remaining $250,000 on May 30, 2007, the day the TSPA was executed. (James Aff., p. 185; Key Dep. 205:16–215:4.)

[5] CSPA I had an effective date of May 30, 2007. (Frazier Aff. ¶ 4.)

{13} Having substantially increased his investment in McKee Craft, James indicated to Key that the January 10, 2008, $50,000 loan was the "final straw" and that if McKee Craft needed additional funds, he would need to renegotiate his interest in the Company. (James Aff. ¶¶ 21–22, p. 60.). James also made a note to himself around this time concerning the liquidation value of the Company's inventory. (Pls.' Ex. 20.)

{14} On February 6, 2008, the parties executed a Consolidated Share Purchase Agreement ("CSPA II"), which left James holding 88.65% of McKee Craft's outstanding stock. (Frazier Aff. Ex. 7, p. 3.) James paid $8,582.50 for the newly acquired McKee Craft shares, the equivalent of $1 per share. (Frazier Aff. Ex. 6, p. 1.) Plaintiffs allege that they agreed to this arrangement based in part on James's purported promises that, among other things, he would hire advisors to help "turnaround" McKee Craft's business and would retain Plaintiffs as McKee Craft employees. (Compl. ¶¶ 48—57.) These purported promises are not reflected in CSPA II, however, as James specifically declined Key's request to include them in the agreement. (James Aff., p. 148–51; Key Dep. 261:20–267:23; Frazier Aff. Ex. 6.) The parties were represented by counsel in executing CSPA II, which includes a merger clause nearly identical to the merger clause set forth in CSPA I. (Frazier Aff. Ex. 6, p. 4.)

{15} Following execution of CSPA II, James placed Key in charge of government sales and hired Defendant Johnnie Marshburn ("Marshburn"), a

former McKee Craft consultant, to serve as the Company's controller. (Key Dep. 93:22–95:2; Marshburn Dep. 13:6–23:12, 46:16–49:2.) McKee Craft's financial condition remained bleak, however, as the Company was not immune to the ailing economy of 2008, the detrimental effects of which caused numerous other boat manufacturers, *i.e.*, companies in McKee Craft's line of business, to cease operations around this time. (Vickers Dep. 195:10–197:6, Mar. 17, 2011; Wilkerson Dep. 23:12–24:25, Oct. 16, 2013; James Aff. ¶ 32.) Key has acknowledged the damage caused to McKee Craft by the economic recession. (James Aff., p. 153.)

{16} James formed several new entities, including Coconut Holdings and Marine Contract Manufacturing ("MCM"), between February and April 2008. (James Dep. 143:11–148:6.) James established and capitalized Defendant Coconut Holdings specifically to acquire real estate in Lumberton to be used for new McKee Craft facilities, though the plan ultimately fell through. (James Dep. 144:8—12.) James also formed MCM in order to build boats for McKee Craft and to serve as backup facilities in the event creditors foreclosed on McKee Craft's plant. (James Dep. 147:2—25.) Plaintiffs allege that James formed these entities as part of a plan to start a new boating company – without Plaintiffs – using McKee Craft's historic assets.

{17} James ceased McKee Craft's business operations sometime between June and August 2008. (James Dep. 148:24—149:6.) James cites the "[w]orldwide economic meltdown, high fuel prices," and unanticipated debt

obligations as factors that contributed to this decision. (James Dep. 143:11—144:3.) He also laid off most of McKee Craft's employees, including Key, explaining to them that his financial exposure had far exceeded what he had expected based on his initial discussions with Key. (James Dep. 143:11–144:3; James Aff., p. 121–124, 128.)

{18} Key subsequently attempted to reacquire James's McKee Craft shares and to repay the money that James had loaned to the Company, but he was unable to secure adequate funding to do so. (James Aff., p. 127, 129, 131–158) In an email to James dated February 13, 2009, Key states as follows:

> I appreciate what you have done, and I stand behind my conviction that I will get funded next week. I never wanted you or anyone to lose any money with McKee Craft. In hindsight the market conditions now may have caused major problems as we are seeing now.

(James Aff., p. 153.)

{19} By May 2009, James had begun the process of winding up McKee Craft. Through counsel, James contacted Country Boys Auction & Realty ("Country Boys") to schedule an auction for the sale of McKee Craft's boat molds and plugs, the Company's primary and most valuable remaining assets. (Shannon Hoff Dep. 60:22—65:21, Aug. 23, 2011.) Following an advertising campaign, which Plaintiffs contend failed to provide adequate notice to prospective buyers, Coconut Holdings purchased the McKee Craft boat molds and plugs for $40,000 at an auction held July 30, 2009. (Pls.' Ex. 68.)

{20} Coconut Holdings subsequently acquired ownership of the McKee Craft trademarks, which had been excluded from the auction, for a purchase price of $1,000. (Pls.' Ex. 76 at 79:8–81:19.)

{21} Coconut Holdings continues to own the McKee Craft trademarks, but does not use them. (Pls.' Ex. 76 at 49:25–50:3.)

{22} Since winding up McKee Craft, James has used the historic McKee Craft boat molds to build boats through a separate entity, MHM Marine ("MHM"). (Pls.' Ex. 74, p. 56:8—56:16.) It is unclear based on the submissions of record whether MHM continues to do so.

{23} On August 27, 2009, Plaintiffs filed their original Complaint in this action, asserting numerous claims for relief against James and Marshburn.[6] Plaintiffs' claims against James allege, in essence, that McKee Craft was a valuable and successfully operating company before James, through misrepresentations, broken promises, and other alleged deceitful conduct, acquired and looted the Company, leaving Plaintiffs "broke and destitute." (Pls.' Br. Opp. James Mot. S.J., p. 2.)

{24} This action was subsequently designated a mandatory complex business case and assigned to this Court (Murphy, J.) on October 26, 2009. The case was reassigned to the undersigned on July 2, 2014.

---

[6] Because Marshburn has not moved for summary judgment, the Court will not discuss Plaintiffs' claims against him except to the extent necessary to resolve the present Motions.

{25} Plaintiffs filed a Second Amended Complaint[7] (hereinafter, the "Complaint") on October 13, 2010, joining Coconut Holdings as a Defendant and McKee Craft as a Nominal Defendant to this action. The Complaint asserts direct claims as well as derivative claims brought by Plaintiffs on behalf of McKee Craft in their capacity as McKee Craft shareholders.

{26} The Court (Murphy, J.) has dismissed many of Plaintiffs' claims through Orders previously entered in this action. *McKee v. James*, No. 09 CVS 03031 (N.C. Super. Ct., April 14, 2010) (denying Plaintiffs' request for injunctive relief); *McKee v. James*, No. 09 CVS 03031 (N.C. Super. Ct., June 10, 2010) (granting in part and denying in part Defendant's first motion to dismiss); *McKee v. James*, 2013 NCBC 38 (N.C. Super. Ct., July 24, 2013) (granting in part and denying in part James's second Motion to Dismiss).

{27} Still pending before the Court are Plaintiffs' claims against James for breach of contract (direct), fraud (direct), breach of fiduciary duty (direct and derivative), gross mismanagement (derivative), civil conspiracy (direct and derivative), conversion (derivative), unfair and deceptive trade practices ("UDTP") (direct and derivative), unjust enrichment (derivative), and punitive damages. Also pending are Plaintiff's claims against Coconut Holdings, consisting of the same claims that remain pending against James, but which are premised upon a "piercing the corporate veil" theory of recovery.[8]

---

[7] Plaintiffs had previously filed a First Amended Complaint on June 15, 2010.

[8] As noted above, the Court will not address Plaintiffs' claims against Marshburn.

{28}   On January 31, 2014, both James and Coconut Holdings moved for summary judgment with respect to Plaintiffs' remaining claims against them pursuant to Rule 56 of the North Carolina Rules of Civil Procedure.  That same day, James also moved pursuant to Rule 702 of the North Carolina Rules of Evidence to exclude certain testimony proffered by four of Plaintiff's purported expert witnesses.

{29}   The Court held a hearing on these matters on September 25, 2014.

II.

ANALYSIS

A.

James's Motion for Summary Judgment

{30}   James seeks an order granting summary judgment in his favor and dismissing Plaintiffs' remaining claims against him with prejudice.  The Court will examine the merits of James's Motion for Summary Judgment with respect to each of Plaintiff's claims, in turn, below.

Legal Standard

{31}   Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2014). The party moving for summary judgment may prevail on its motion by demonstrating (1) that an essential element of the plaintiff's claim is nonexistent; (2) that the plaintiff is unable to produce evidence to support an

essential element of the claim; or (3) that the plaintiff cannot surmount an affirmative defense that bars the claim as a matter of law. *Hash v. Estate of Henley*, 190 N.C. App. 645, 647, 661 S.E.2d 52, 53 (2008). The movant's contentions are to be "carefully scrutinized while those of the opposing party are indulgently regarded." *DeCarlo v. Gerryco, Inc.*, 46 N.C. App. 15, 19, 264 S.E. 370, 373 (1980). The party opposing summary judgment may not, however, "rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." N.C.G.S. § 1A-1, Rule 56(e) (2014).

### Breach of Contract (Direct)

{32} "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000).

### TSPA II

{33} Plaintiffs predicate their breach of contract claim primarily upon James's alleged failure to honor a number of promises that he purportedly made in connection with TSPA II. (Compl. ¶¶ 105—07.) Specifically, Plaintiffs contend that they relinquished their McKee Craft stock, and thus a controlling interest in the Company, in reliance on James's purported promises to do the following:

[i] Provide funding for the expansion of [McKee Craft];

[ii]   Pay the creditors of the Company pursuant to agreements reached with those creditors;

[iii]  Provide continuing employment of the Plaintiffs by the Company at a salary commensurate with the skill and knowledge level of the Plaintiffs and their years of service building the Company;

[iv]   Provide continuing health insurance benefits to the Plaintiffs;

[v]    Protect the assets of the Company and transfer the stock of the Company back to the Plaintiffs at such time as the Company was realizing the rewards of the new government contracts and sales;

[vi]   Continue to honor the warranty obligation of the Company to its customers; and

[vii]  Protect the Plaintiff's [sic] personal property which was pledged to secure debts of the Company.

(Compl. ¶ 107.) Plaintiffs allege that James breached every one of these promises to Plaintiffs' detriment.

{34} Where a contract is reduced to writing, "[p]arol testimony of prior or contemporaneous negotiations inconsistent with [the] written contract, or which tends to substitute a new or different contract for the one evidenced by the writing, is incompetent." *West Jefferson v. Edwards*, 74 N.C. App. 377, 379, 329 S.E.2d 407, 409 (1985). Our Supreme has explained the parol evidence rule as follows:

> A contract not required to be in writing may be partly written and partly oral. However, where the parties have deliberately put their engagements in writing in such terms as import a legal obligation free of uncertainty, it is presumed the writing was intended by the parties to represent all their engagements as to the elements dealt with in the writing. Accordingly, all prior and

> contemporaneous negotiations in respect to those elements are deemed merged in the written agreement. And the rule is that, in the absence of fraud or mistake or allegation thereof, parol testimony of prior or contemporaneous negotiations or conversations inconsistent with the writing, or which tend to substitute a new and different contract from the one evidenced by the writing, is incompetent.

*Id.* (quoting *Neal v. Marrone*, 239 N.C. 73, 77, 79 S.E. 2d 239, 242 (1953)).

{35} A merger clause reinforces the parol evidence rule by "creat[ing] a rebuttable presumption that the writing represents the final agreement between the parties." *Zinn v. Walker*, 87 N.C. App. 325, 333, 361 S.E.2d 314, 318 (1987)). "Generally, in order to effectively rebut the presumption, the claimant must establish the existence of fraud, bad faith, unconscionability, negligent omission or mistake in fact." *Id.* North Carolina courts have also declined to enforce merger clauses where doing so "would frustrate and distort the parties' true intentions and understanding regarding the contract[.]" *Id.* at 333, 361 S.E.2d at 318—19 (citing *Loving Co. v. Latham*, 20 N.C. App. 318, 201 S.E.2d 516 (1974), wherein the court held that "to permit the standardized language in the printed forms, . . . to nullify the clearly understood and expressed intent of the contracting parties would lead to a patently unjust and absurd result" (ellipsis in original)).

{36} Here, the alleged breaches are based on oral representations made by James prior to CSPA II, the parties' written agreement which encompasses the subject matter of James's purported promises but which is devoid of any reference to such promises. CSPA II also includes a merger clause specifying

that CSPA II represents the parties' entire agreement concerning the transaction in question, namely, James's purchase of a controlling interest in McKee Craft. Any promises made by James or Plaintiffs prior to CSPA II have thus been superseded by CSPA II, and are therefore irrelevant, absent a showing of fraud or other grounds to rebut the presumption that CSPA II represented the parties' final agreement.

{37}   Plaintiffs insist that they never would have relinquished their McKee Craft shares at a price of $1 per share absent James's purported promises, that they were defrauded into doing so, and that failure to construe James's promises as part of CSPA II "would frustrate and distort the parties' true intentions and understanding regarding [their agreement.]" *See Zinn*, 87 N.C. App. at 333, 361 S.E.2d at 318—19.

{38}   The undisputed evidence before the Court reveals neither evidence of fraud in connection with CSPA II nor evidence that Plaintiffs' intentions concerning CSPA II would be "frustrated" if James's purported promises are excluded from CSPA II. To the contrary, the undisputed evidence indicates that Plaintiffs understood what they were giving up in executing CSPA II and also understood that James's promises were not part of that agreement. Specifically, Plaintiffs, who were represented by counsel in the transaction, acknowledged that they were not "capable and willing to provide or secure sufficient equity or debt financing to solve the Corporation's severe financial need" and that McKee Craft's "common stock [was] worth only a nominal

amount." (Frazier Aff. Ex. 7, pg. 1.)  The evidence also reveals that Key, on the advice of counsel, sought inclusion of James's purported promises in CSPA II, but James specifically refused.  (James Aff., p. 148–51; Key Dep. 261:20–267:23.)

{39}  *Zinn v. Walker*, 87 N.C App. 325, 361 S.E.2d 314 (1987), the case cited by Plaintiffs in support of their contention on this issue, is easily distinguished from the present case.  *Zinn* involved three contemporaneously executed contracts, the third of which set forth boilerplate language containing a merger clause.  *Id.* at 333, 361 S.E.2d at 318.  The court determined that because the parties intended the three contracts to be construed as a single agreement, neither the parol evidence rule nor the merger clause in the third contract precluded evidence concerning the earlier contracts.  *Id.* at 332—33, 361 S.E.2d at 318—19.  Here, in contrast, the parties knew that James's earlier promises were not integrated into CSPA II – and therefore could not have intended for them to be part of the agreement – because Key requested their inclusion and James specifically rejected them.  Although there is no need to inquire further, the Court additionally notes that, unlike the boilerplate provisions of the contract in *Zinn*, the contract here, CSPA II, consisted of provisions carefully negotiated by counsel on both sides of the transaction.  *See Huttenstine v. Mast*, 537 F. Supp. 2d 795, 803—04 (E.D.N.C. 2008) (distinguishing a contract that had been "extensively negotiated between counsel of the parties" from the "preprinted boilerplate provisions" at issue in *Zinn* in concluding that the court

was "compelled to give effect to the [contract's] merger clause" under the circumstances). Accordingly, the Court finds no basis to circumvent the parties' bargained-for merger clause in the instant case and concludes that CSPA II supersedes any purported promises made by James prior to that agreement.

## McKee Craft's Cash Flow Plan

{40} The Court also finds no merit in Plaintiffs' contention that James breached a promise to contribute $1.35 million to McKee Craft in connection with a cash flow plan drafted by a Company consultant in February 2008. The undisputed evidence shows that the cash flow plan was not part of any contract between the parties and does not reflect whether James's personal funds were to serve as the source of the contribution. (Pls.' Ex. 103.) James in fact procured a $1.4 million line of credit for McKee Craft in March 2008, after Key had struggled for some time to obtain a loan on the Company's behalf. (Pls.' Ex. 49.) Moreover, Key could not recall in his deposition testimony any amount that James had failed to pay McKee Craft (Key Dep. 205:16–215:4.), and Jennifer Shumpert, McKee Craft's in-house accountant, testified only that the "cash flow plan . . . showed approximately $1.5 million cash injection" and that she "believe[d] Hunt James was going to invest $1.5 million once he obtained a majority interest." (Shumpert Aff. ¶ 4.) There is no evidence, in other words, that James breached any promise made in connection with the $1.35 million contribution contemplated by the cash flow plan.

## Confidentiality Agreement

{41} Plaintiffs further contend that James breached the Confidentiality Agreement that he signed in April 2007, when he was considering his initial investment in McKee Craft, because "from the very beginning" he intended to use the information he gathered on McKee Craft to form his own boat manufacturing company. (Pls.' Br. Opp. James Mot. S.J., p. 33.) Plaintiffs specifically cite only the Confidentiality Agreement itself in support of this contention, and the Court, having reviewed the record, finds no evidence to suggest that James actually used any of the information acquired in his initial investigation of McKee Craft in violation of the Confidentiality Agreement. Accordingly, this contention is without merit.

## TSPA and CSPA I

{42} Plaintiffs contend that James also breached the TSPA and CSPA I. Citing neither specific evidence of James's alleged breaches of these agreements nor authority to support their position, Plaintiffs sweepingly aver that these agreements "presumed and included in their intent that James would (a) give his best efforts to McKee Craft and not some competing enterprise; (b) invest heavily in the company to cause its turnaround; [and] (c) provide the company with his expertise and [that of] others." (Pls.' Br. Opp. James Mot. S.J., p. 33.) It is undisputed, however, that the TSPA did not include these "presumed" terms; that CSPA I superseded the TSPA; that CSPA I did not include these terms; and that CSPA I included a merger clause

specifying that CSPA I represented "the entire agreement and understanding of the parties relating to the subject matter [t]herein and merge[d] all prior discussions and agreements between them, including the [TSPA]." (Frazier Aff. ¶ 3; Pls.' Ex. 104, p. 14.) Plaintiffs' contention that the proffered terms should be implied into these agreements is thus without merit.[9]

{43} The Court notes the allegations in Plaintiffs" Complaint that James breached the TSPA when he "delayed in delivering part of the [$300,000] capital he had promised in exchange for the [McKee Craft] shares." (Compl. ¶ 37.) These allegations are contradicted by the record evidence, which reveals that James provided the full $300,000 contribution by May 30, 2007, one day prior to the May 31, 2007 deadline imposed by the TSPA. Key in fact conceded the timeliness of this contribution in his deposition testimony and, as noted above, was unable to identify *any* payment that James had delayed or withheld from the Company. (Key Dep. 205:16–215:4.) Indeed, Key was unable to reconcile his testimony with the allegations set forth in paragraphs 37 through 40 of the Complaint, which assert that James delayed the $300,000 contribution; that "[i]n the meantime, accounts payable began to stack up, resulting in crippling interest and penalties owed to creditors"; that "James purposely slowed the investment of capital to create a perilous financial condition for the company"; and that "[a]s a result of [James's] failure to provide the promised capital, [McKee Craft] would need to seek bankruptcy re-

---

[9] The Court also declines, to the extent it is argued, to read these terms into CSPA II for the same reasons.

organization or another source of capital." (Compl. ¶¶ 37—40.) The Court accordingly finds no evidentiary support for Plaintiffs' contentions concerning James's alleged breaches of the parties' shareholder agreements.

### Additional Promises

{44} Plaintiffs vaguely allude to other contracts "supported by the consideration" that James also purportedly breached. (Pls. Br. Opp. James Mot. S.J., p. 33.) Plaintiffs have failed to identify such contracts, however, much less evidence that would create an issue of material fact concerning whether they were breached. *See Charlotte Motor Speedway, LLC v. Cnty. of Cabarrus*, 748 S.E.2d 171, 175 (N.C. Ct. App. 2013), *review allowed*, 753 S.E.2d 664 (N.C. 2014) (providing that "claims for breach of contract . . . necessarily hinge on the threshold issue of whether a valid contract actually existed between [the parties]").

{45} Accordingly, in light of the foregoing, the Court GRANTS James's Motion for Summary Judgment with respect to Plaintiffs' breach of contract claim and DISMISSES this claim with prejudice.

### Fraud (direct)

{46} A plaintiff must establish the following elements in order to prevail on a fraud claim:

> (1) that the defendant made a representation of a material past or present fact; (2) that the representation was false; (3) that it was made by the defendant with knowledge that it was false or made recklessly without regard to its truth; (4) that the defendant intended that the plaintiff rely on the representation; (5) that the plaintiff did reasonably rely on it; and (6) injury.

*Braun v. Glade Valley Sch., Inc.*, 77 N.C. App. 83, 87, 334 S.E.2d 404, 407 (1985) (citing *Johnson v. Phoenix Mutual Life Ins. Co.*, 300 N.C. 247, 266 S.E. 2d 610 (1980)). Whereas "a mere promissory representation will not support an action for fraud[,] . . . a promissory misrepresentation may constitute actual fraud if the misrepresentation is made with intent to deceive and with no intent to comply with the stated promise or representation." *Id.* (citations omitted).

{47} Plaintiffs predicate their fraud claim in part upon James's purported promises discussed above in connection with Plaintiffs' breach of contract claim. Having dismissed Plaintiffs' breach of contract claim, *supra*, Plaintiffs' fraud claim likewise fails to the extent that it relies on those same purported promises. To the extent Plaintiff contends that James induced them to relinquish their McKee Craft shares through representations that did not rise to the level of promises, the Court finds that Plaintiffs are unable to show that their reliance on such representations was reasonable under the circumstances.[10] Indeed, James and Plaintiffs engaged in numerous discussions, wherein James made many representations to Plaintiffs, and Key, likewise, made many representations to James, concerning, for instance, McKee Craft's potential for growth when he and James began discussing

---

[10] Plaintiffs contend that reliance is not a necessary element of fraud when the underlying allegations concern the defendant's failure to disclose information (Pls.' Br. Opp. James Mot. S.J., p. 35–36.) This contention is irrelevant for purposes of the present analysis, however, as the Court (Murphy, J.) has previously dismissed Plaintiffs' fraudulent concealment claim. *McKee*, 2013 NCBC 38, at ¶¶ 50–57.

James's investment in the Company. The precise contours of the parties' arrangement, however, were carefully negotiated, reduced to writing, and clearly defined in the parties' three shareholder agreements – the TSPA, CSPA I, and CSPA II. Though Plaintiffs may have been induced into these agreements by their desire to save McKee Craft, there is no indication that they were defrauded into entering them. As discussed above, Plaintiffs were represented by counsel and were cognizant of the fact that the parties' negotiated, written agreement, CSPA II, neglected to formalize some of the assurances that they had requested. (Frazier Aff. Ex. 7 at 1.) The Court concludes, therefore, that any reliance by Plaintiffs on James's pre-CSPA II representations concerning the subject matter of that agreement, the breadth of which encompasses the alleged misrepresentations of which Plaintiffs now complain, was unreasonable as a matter of law. *See, e.g., Johnson v. Owens*, 263 N.C. 754, 758, 140 S.E.2d 311, 314 (1965) ("When the circumstances are such that a plaintiff seeking relief from alleged fraud must have known the truth, the doctrine of reasonable reliance will prevent him from recovering for a misrepresentation which, if in point of fact made, did not deceive him."); *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 341 (4th Cir. 1998) ("[I]f a plaintiff had an alternative source for the information that is alleged to have been concealed from or misrepresented to him, his ignorance or reliance on any misinformation is not reasonable.").

{48} Plaintiffs additionally support their fraud claim with allegations that James intentionally misrepresented himself as an experienced, sophisticated investor, who sought to use his resources and experience to restore McKee Craft to profitability, when in fact James intended all along to take control of the Company, plunder its value and assets, and then use those assets to start a new boat manufacturing company, leaving Plaintiffs in his wake. Plaintiffs have put forth no evidence, however, to support this theory. To the contrary, and to the extent that these representations are not subsumed within the subject matter of CSPA II, the undisputed evidence shows that James invested substantial time and resources in McKee Craft, an established but faltering company, in the midst of an economic recession. The evidence indicating that James marketed himself as willing and able to turnaround McKee Craft's business, but then failed to do so, at most reflects puffery, not actionable fraud, and as such provides no grounds for Plaintiffs' requested relief. *Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 544 (M.D.N.C. 2013) ("[S]tatements that consist of nothing more than indefinite statements of corporate optimism, also known as 'puffery,' are immaterial as a matter of law." (Citation and quotation marks omitted)); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 211 (4th Cir. 1994) (affirming dismissal of fraud claim because statements in question consisted of "puffing statements" upon which "[n]o reasonable investor would rely"); *Howard v. Haddad,* 962 F.2d 328, 331

(4th Cir. 1992) (affirming dismissal of fraud claim because the alleged misrepresentations constituted "puffery" and not material statements of fact).

{49} Accordingly, the Court GRANTS James's Motion for Summary Judgment with respect to Plaintiffs' fraud claim and DISMISSES this claim with prejudice.

Breach of Fiduciary Duty (direct and derivative)

{50} Plaintiffs contend that James, as McKee's Craft majority shareholder, breached duties owed to them, as minority shareholders, and also breached duties owed to the Company itself.

{51} "A claim for breach of fiduciary duty requires the existence of a fiduciary relationship." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 293, 603 S.E.2d 147, 155 (2004)  "[I]n North Carolina majority shareholders owe a fiduciary duty and obligation of good faith to minority shareholders as well as to the corporation." *Loy v. Lorm Corp.*, 52 N.C. App. 428, 432, 278 S.E.2d 897, 901 (1981).  Our Supreme Court has explained as follows:

> The devolution of unlimited power imposes on holders of the majority of the stock a correlative duty, the duty of a fiduciary or agent, to the holders of the minority of the stock, who can act only through them -- the duty to exercise good faith, care, and diligence to make the property of the corporation produce the largest possible amount, to protect the interests of the holders of the minority of the stock, and to secure and pay over to them their just proportion of the income and of the proceeds of the corporate property. The controlling majority of the stockholders of a corporation, while not trustees in a technical sense, have a real duty to protect the interests of the minority in the management of the corporation, especially where they undertake to run the corporation without giving the minority a voice therein. This is so because the holders of a majority of the stock have a community of interest with the minority holders in the same property and

because the latter can act and contract in relation to the corporate property only through the former. It is the fact of control of the common property held and exercised, and not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation on the part of the majority stockholders in a corporation for the minority holders. Actual fraud or mismanagement, therefore, is not essential to the application of the rule.

*Gaines v. Long Mfg. Co.*, 234 N.C. 340, 344—45, 67 S.E.2d 350, 353 (1951).

{52} "[M]inority shareholders in a closely held corporation who allege wrongful conduct and corruption against the majority shareholders in the corporation may bring an individual action against those shareholders, in addition to maintaining a derivative action on behalf of the corporation." *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 405, 537 S.E.2d 248, 259 (2000).

### Competing Entities & Country Boys Auction

{53} Plaintiffs contend that James breached fiduciary duties to McKee Craft by forming competing entities, which, in essence, diverted James's attention and resources away from McKee Craft. Plaintiffs primarily take issue with Coconut Holdings, describing it as an "alter ego" of James's that "was formed in order to continue the improper conduct and specifically to purchase, for a small percentage of their true value, the molds and plugs of [McKee Craft]." (Compl. ¶ 121.)

{54} James explained in his deposition testimony that he formed Coconut Holdings with the specific objective of using the entity to acquire new facilities for McKee Craft in Lumberton. James further testified that he formed another

entity, MCM, essentially as a prophylactic measure, to provide alternate facilities in the event that creditors moved to foreclose on McKee Craft's plant, as the Company was heavily encumbered with debt. There is no evidence, only allegations, to suggest that James's formation of these other entities harmed McKee Craft. Similarly, there is no evidence to suggest that James used the McKee Craft assets in operating any business other than that of McKee Craft until November 2009, after McKee Craft had ceased operations and sold its assets in liquidation.

{55} With respect to Coconut Holdings's purchase of the McKee Craft assets at the July 30, 2009 auction, Plaintiffs assert that James, through counsel Shannon Hoff, intentionally provided inadequate notice of the auction in order to suppress advertising, minimize bidders, and essentially ensure that James, through Coconut Holdings, would be able to purchase the assets well below market price.

{56} The undisputed evidence reveals that Ms. Hoff contacted Country Boys in May 2009 to set up an auction at which the McKee Craft boat molds and plugs would be sold in furtherance of James's plan to wind up the Company, and that although Country Boys advised that it needed forty-five (45) days to advertise the auction, Ms. Hoff did not give the final go ahead to begin advertising until approximately one week before the auction. Nevertheless, advertisements placed online, including on Auction Zip, "the largest directory of live auction listings in the United States," in addition to

advertisements placed in eight North Carolina newspapers, garnered "approximately 80 to 100 phone calls from potential bidders inquiring about the boat molds and plugs." (Mike Gurkins Aff. ¶¶ 3–7.) Indeed, the undisputed evidence reveals that approximately twenty people attended the auction and that, among these twenty people, at least four submitted bids for the molds and plugs. (Gurkins Aff. ¶¶ 7–8; Marshburn Dep. 129:7–130:20).

{57} Plaintiffs complain that the $40,000 paid by Coconut Holdings for the McKee Craft assets represented only "a small percentage of their true value[.]" (Compl. ¶ 121.) Even ignoring the fact that Coconut Holdings's bid prevailed over the bids of several others at the auction, however, there is no indication, based upon the undisputed evidence before the Court, that $40,000 was an unexpectedly low bid under the circumstances. Plaintiffs offer Key's deposition testimony that the McKee Craft boat molds were assigned a liquidation value of $250,000 in September 2006, but this valuation fails to take into account the obvious and crushing impact of the 2008 recession on the boating industry. (Key Dep., 163:4—164:13.).

{58} Plaintiffs' only evidence concerning the value of the assets in question at the time of the July 30, 2009 auction consists of an affidavit from William Holseberg, in which Mr. Holseberg, who has been in the boating business for more than twenty-five (25) years, represents that he would have paid "substantially more" than $40,000 for the molds had he been aware of the auction. (Pls.' Ex. 92, p. 2.) This attempt by Plaintiffs to create a genuine issue

of material fact must fail, however, as simply tendering an affidavit from one individual who claims that he would have paid "substantially more" for the assets does nothing to show that Coconut Holdings's $40,000 bid was below (liquidation) market value, much less that the bid – which, again, prevailed over several other bidders at an auction attended by twenty people – was so unreasonably low that James breached a duty to the Company in conducting the sale. Accordingly, the Court finds that Plaintiffs have failed to produce the requisite forecast of evidence to support this contention.

### Bank of America Line of Credit

{59} Plaintiffs contend that James breached duties owed to McKee Craft and Plaintiffs when he obtained a $1.4 million loan from Bank of America on behalf of the Company, instead of personally contributing the $1.35 million contemplated in the Company's February 2008 cash flow plan. (Pls.' Br. Opp. James Mot. S.J., p. 29.) The undisputed evidence reveals, however, that James and Key discussed the $1.4 million loan and Key did not object; that Key had previously tried to obtain loans on behalf of the Company without success; and that the cash flow plan neither required that the contemplated $1.35 million contribution derive from James's personal funds nor became part of any contract between the parties. Accordingly, Plaintiffs' contention is without evidentiary support.

### James's Right of First Refusal

{60} Plaintiffs next contend that James breached a fiduciary duty to the Company by "[u]sing [his] right of first refusal to block other deals so [that he could] raid the corporate assets . . . ." (Pls. Br. Opp. James Mot. S.J., p. 30.) Plaintiffs, however, have failed to produce evidence of any deals that James purportedly blocked using his right of first refusal. Accordingly, this contention is without merit, irrespective of whether conduct of the nature alleged would constitute a breach of fiduciary duty.

### Government Sales

{61} Plaintiffs next contend that James breached a fiduciary duty to the Company by "cancel[ing] lucrative orders for boats for no apparent reason." (Pls. Br. Opp. James Mot. S.J., p. 30.) There is no evidence, however, that James ever cancelled any sales order. To the contrary, Rowland Turner, who worked with Key on McKee Craft's government contracts, stated in his deposition testimony that "[t]here were no government orders cancelled" during his employment with the Company. (Turner Dep. 53:11—53:18, Oct. 17, 2013.)

### Plaintiffs' Employment with McKee Craft

{62} Plaintiffs contend that James breached a fiduciary duty to them when he terminated their employment with McKee Craft.

{63} Minority shareholders may have a reasonable expectation of continued employment with the company. *Clark v. B.H. Holland Co., Inc.,* 852

F. Supp. 1268, 1274, n. 2 (E.D.N.C. 1994) (citing *Meiselman v. Meiselman,* 309 N.C. 279, 290, 307 S.E.2d 551, 558 (1983)). The question of whether such expectation is reasonable constitutes a question of fact not appropriately resolved on a motion for summary judgment "unless 'it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law.'" *Clark*, 852 F. Supp. at 1274 (quoting *Pierce v. Ford Motor Co.,* 190 F.2d 910, 915 (4th Cir. 1951)).

{64} Here, it is "perfectly clear" that Plaintiffs did not have a reasonable expectation of continued employment with McKee Craft. James explicitly declined to provide such an assurance in CSPA II, which governed the parties' arrangement following James's acquisition of a majority interest in McKee Craft. This contention accordingly fails for reasons detailed above in connection with Plaintiffs' breach of contract claim.

{65} The Court has reviewed Plaintiffs' remaining contentions in support of their breach of fiduciary claim and finds them to be without evidentiary support. Accordingly, the Court GRANTS James's Motion for Summary Judgment with respect to Plaintiffs' breach of fiduciary duty claims and DISMISSES these claims with prejudice.

Gross Mismanagement (derivative)

{66} Plaintiffs cite no evidence to support their gross mismanagement claim specifically and instead rely on the same allegations discussed above in connection with their breach of fiduciary duty claims. The Court found no merit in these contentions, *supra,* and finds no merit in them here as well.

{67} Accordingly, the Court GRANTS James's Motion for Summary Judgment with respect to Plaintiffs' gross mismanagement claim and DISMISSES this claim with prejudice.

### Conversion (derivative)

{68} "Conversion is defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" *Gallimore v. Sink*, 27 N.C. App. 65, 67, 218 S.E.2d 181,183 (1975) (citations omitted) (emphasis added).

{69} Plaintiffs' predicate their conversion claim upon allegations that James sold McKee Craft's assets "below market price, and corporate assets went missing[.]" (Pls.' Br. Opp. James Mot. S.J., p. 38.) The Court has addressed and rejected Plaintiffs' contention concerning the propriety of the July 30, 2009 auction at which the McKee Craft assets were sold, *supra*, and Plaintiffs fail to identify any evidence to support their assertion that James converted McKee Craft assets that "went missing."

{70} Accordingly, the Court GRANTS James's Motion for Summary Judgment with respect to Plaintiffs' conversion claim and DISMISSES this claim with prejudice.

### Unjust Enrichment (derivative)

{71} "Under North Carolina law, a plaintiff demonstrates unjust enrichment by showing that 'it conferred a benefit on another party, that the other party consciously accepted the benefit, and that the benefit was not

conferred gratuitously or by an interference in the affairs of the other party.'" *WJ Global LLC v. Farrell*, 941 F. Supp. 2d 688, 693 (E.D.N.C. 2013) (citation omitted).

{72} The Court finds, upon thorough review, that Plaintiffs' evidence fails to disclose any benefit conferred on James by McKee Craft that would support a claim for unjust enrichment.

{73} Accordingly, the Court GRANTS James's Motion for Summary Judgment with respect to Plaintiffs' unjust enrichment claim and DISMISSES this claim with prejudice.

<u>Civil Conspiracy (Direct and Derivative)</u>

{74} Plaintiffs allege that James, Marshburn, and Coconut Holdings "formed a conspiracy to shut down McKee Craft and raid the assets." (Pls.' Br. Opp. James Mot. S.J., p. 40.); Compl. ¶¶ 161–66.) James contends that summary judgment is appropriate because "Plaintiffs are wholly unable to point to any actual agreement between James and Marshburn." (James Br. Supp. Mot. S.J., p. 31.)

> A threshold requirement in any cause of action for damages caused by acts committed pursuant to a conspiracy must be the showing that a conspiracy in fact existed. The existence of a conspiracy requires proof of an agreement between two or more persons. Although civil liability for conspiracy may be established by circumstantial evidence, the evidence of the agreement must be sufficient to create more than a suspicion or conjecture in order to justify submission to a jury.

*Henderson v. LeBauer*, 101 N.C. App. 255, 261, 399 S.E.2d 142, 145 (1991) (citations omitted).

{75} Plaintiffs offer in-house accountant Shumpert's affidavit, in which Ms. Shumpert states that "Marshburn told me . . . that he was hired to shut down McKee Craft." (Shumpert Aff. ¶ 8.). Ms. Shumpert clarified in her deposition, however, that Marshburn's statement reflected in her affidavit was based upon his suspicion alone and not on any statement or particular pattern of behavior by James (Shumpert Dep. 44:17–45:20, Oct. 16, 2013.)

{76} Plaintiffs allege that James and Marshburn made a concerted effort to exclude Key from certain aspects of McKee Craft's operations, concerning, for example, the hiring of Company employees, (Pls.' Ex. 50), and access to the Company's accounting software. (Lewis Dep. 37:15–25, Oct. 16, 2013.) Mashburn testified in his deposition, however, that he and James never discussed excluding Key from Company information or management decisions. (Marshburn Dep. 50:8–18.)

{77} The Court finds Plaintiffs' evidence insufficient to create more than a suspicion or conjecture that there existed the requisite agreement between James and Marshburn to demonstrate the existence of a civil conspiracy and support submission of this claim to a jury. Accordingly, the Court GRANTS James's Motion for Summary Judgment with respect to Plaintiffs' civil conspiracy claim and DISMISSES this claim with prejudice.

### Unfair and Deceptive Trade Practices (Direct and Derivative)

{78} North Carolina's Unfair and Deceptive Trade Practices Act ("the Act") targets "unfair or deceptive acts or practices in or affecting commerce[.]" N.C.G.S. § 75-1.1(a) (2014). Although the Act broadly defines "commerce" to

include "all business activities, however denominated," N.C.G.S § 75-1.1(b) (2014), our Courts have held that the Act "is not intended to apply to all wrongs in a business setting." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 593, 403 S.E.2d 483, 492 (1991).

{79} To establish the "commerce" requirement, the defendant's conduct "must affect commerce in a commercial setting, . . . not in a private relationship type setting such as corporate governance issues, . . . securities transactions, . . . or disputes arising from employment[.]" *In re Brokers, Inc.*, 396 B.R. 146, 161 (Bankr. M.D.N.C. 2008) (citations omitted). "Matters of internal corporate management . . . do not affect commerce as defined by Chapter 75 and our Supreme Court." *Wilson v. Blue Ridge Elec. Membership Corp.*, 157 N.C. App. 355, 358, 578 S.E.2d 692, 694; *see also White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010) (explaining that the Act applies to "(1) interactions between businesses, and (2) interactions between businesses and consumers").

{80} At an earlier stage of these proceedings, this Court (Murphy, J.) observed the following with respect to Plaintiffs' UDTP claims:

> Although many of Plaintiffs' allegations in the Complaint relate to the internal dispute between the shareholders and the sale of stock in McKee Craft, Plaintiffs also allege other actions as the basis of their claims, including that James improperly (1) informed government purchasers that their orders would not be filled, (2) directed staff to stop honoring warranty claims of the corporation, (3) sold or gave away boats already manufactured for other entities, and (4) auctioned the molds and plugs used to build boats to Coconut Holdings "for less than reasonable or fair market value." (V. 2nd Am. Compl. ¶¶ 64–65, 72, 151.) These allegations fall outside of the internal dispute and stock sale, and involve interactions with other commercial businesses. Therefore,

> accepting the allegations as true, the Court concludes that James' alleged acts were "in or affecting commerce." Furthermore, because these acts partially form the basis for Plaintiffs' underlying tort claims and, thus, may offend established public policy, *see Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981), the Court concludes that Plaintiffs have sufficiently pled a claim for unfair and deceptive trade practices.

*McKee*, 2013 NCBC 38 at ¶ 71.

{81} Reviewing now the evidence brought forward to support Plaintiffs' allegations, the Court finds that the undisputed evidence of record does not reveal a dispute between McKee Craft and another business or consumers at large, but rather a dispute between Plaintiffs and James as co-owners of McKee Craft. Plaintiffs' evidence, in other words, fails to support the allegations that permitted Plaintiffs to maintain their UDTP claim at the motion to dismiss stage of these proceedings. Additionally, the Court's dismissal of Plaintiffs' claims, *supra*, has extinguished the "underlying tort claims" that this Court (Murphy, J.) previously determined were supportive of Plaintiffs' UDTP claim.

{82} Accordingly, the Court GRANTS James's Motion for Summary Judgment with respect to Plaintiffs' UDTP claim and DISMISSES this claim with prejudice.

<u>Punitive Damages</u>

{83} The Court has dismissed all of Plaintiffs' claims for which compensatory damages are recoverable, *supra*. Absent a viable claim for compensatory damages, there can be no basis for a punitive damages award. *Springs v. City of Charlotte*, 730 S.E.2d 803, 805 (N.C. Ct. App. 2012) ("To

justify an award of punitive damages, the claimant must prove that the defendant is liable for compensatory damages . . . ."'); N.C.G.S. § 1D-15 (2014) (providing that "[p]unitive damages may be awarded *only* if the claimant proves that the defendant is liable for compensatory damages . . ." (emphasis added)).   Accordingly, the Court GRANTS James's Motion for Summary Judgment with respect to Plaintiffs' punitive damages claim and DISMISSES this claim with prejudice.

## B.

### Coconut Holdings's Motion for Summary Judgment

{84}   Coconut Holdings has also moved for summary judgment with respect to all of Plaintiffs' claims against it.   Plaintiffs' claims against Coconut Holdings derive from, and are thus contingent upon, Plaintiffs' claims against James, in that they seek to hold Coconut Holdings liable for James's conduct under a piercing the corporate veil theory. Because the Court has dismissed Plaintiffs' claims against James, however, there remains no basis for recovery against Coconut Holdings.   Accordingly, the Court GRANTS Coconut Holdings's Motion for Summary Judgment, and DISMISSES Plaintiffs' claims against Coconut Holdings with prejudice.

## C.

### James's Motion to Exclude Expert Testimony

{85}   The Court concludes, in light of its dismissal of Plaintiffs' claims against both James and Coconut Holdings, *supra*, that there is no need to inquire into the merits of James's Motion to Exclude Expert Testimony.

Having reviewed the contested testimony, however, the Court notes that admission of such testimony would not alter the conclusions reached above.

III.

CONCLUSION

{86}   For the foregoing reasons, the Court hereby **GRANTS** James's Motion for Summary Judgment, **GRANTS** Coconut Holdings's Motion for Summary Judgment, and **DENIES** as moot James's Motion to Exclude Expert Testimony.

**SO ORDERED**, this the 31st day of December, 2014.